**From:** "gmarkham@nwlink.com" <gmarkham@nwlink.com>
**Subject: Re:** SCANDIES ROSE
**Date:** June 19, 2020 at 4:25:34 PM PDT
**To:** "Michael A. Barcott" <Mbarcott@hwb-law.com>
**Cc:** Kevin Coluccio <kc@coluccio-law.com>, Joe Stacey
<JStacey@maritimelawyer.us>, Nigel Stacey <NStacey@maritimelawyer.us>, Jim
Jacobsen <JJacobsen@maritimelawyer.us>

Dear Mike:

In response to your 6/8/20 below,  I'm not in the habit of repeating an answer
that I've previously given that was clear unless there have been developments
in the interim  that suggest I would change a previously given answer but a
fair amount of time has passed and there have been several exchanges
between us since (although not that I'm aware regarding "leaving or retrieving
the boat" since our exchanges of emails below that to my way of thinking
ended 3/20/20 (below). Your emails of today obviously arrived after this email
was in final draft - let me say in initial response (more later) that I was feeling
bad that my workload and my desire to meticulously document our post
history in this case was taking so long. But I'm not now as your last two emails
resolve any doubt for me that: "All things come to those who waits" *Tout vient
a qui sait attendre" by (Lady Currie) aka Violet Fane*

I've since reviewed all those exchanges and while I feel my clients position on
this issue is sufficiently clear, perhaps a word of clarification is in order as the
answer is contained within several independent emails. Accordingly I've cut
and pasted the below that I feel relevant emails of ease of access to my
client's prior position (which I don't think has really changed) again clear to
you. If you wish to response to this email or other future ones ON THIS ISSUE
I ask that you you do so in a "reply" (pasting any other prior emails that you
feel relevant in with mine chronologically) so we can keep the "thread" going
and anyone reviewing our exchange can see how the events on this issue
unfolded as well.

I write now not to get into a debate about who said what, the emails
adequately express my position as well as to who unilaterally stepped back
from them. I'm not suggesting we had an agreement. Rather that you refused
to make one (or make one on other than your terms which I would not agree
to.

From my point of view these really came into focus after we learned from news accounts (with no advance suggestion from you) that you and your clients insurers had unilaterally engaged Global  to locate the Scandies Rose (SR) and then (again unknown to us) on 1/28/20 responded to the State advising of your intention to  conducted the ROV video examination of it purportedly in response to the State's 1/2/20 letter inquiring of your clients intentions (both with respect to her remaining on state lands and its oil pollution concerns). This was done without consulting me or my clients (or anyone else but your clients underwriters) so far as I am aware, about your plans.  I learned of it through news accounts after Global's  tug left Kodiak.

Upon learning of that Kevin Coluccio and I tried to contacted you to find out what was going on, to express our concerns, and try to secure your cooperation in preserving the  potentially highly relevant evidence as to the cause of this loss given this unique opportunity for all parties to view and video photograph this virtually immediate post accident scene (in real time with our experts watching rather than just yours to make suggestions or requests of views of certain areas, zooms, etc. to preserve what we felt was relevant (or could have been). You were in trial during this period but Daniel and Roy Brown were not, but my emails below reflect that Kevin and my  sincere efforts to still have real time input allowed into that effort (which though the tug had left Kodiak had yet to be undertaken at the scene (with modest additional cost that we could have shared, little effort and virtually no impact on your effort) wasn't permitted. Suffice it to add that this opportunity would have been much more easily requested and and our requests made more meaningfully with the aide of a modicum of advance notice of your clients  effort and disclosure of the nature of equipment and what was to be done and how on you or your clients part. Nor was this the sort of examination that we could have anticipated (nor afford unilaterally). But your response was essentially that this was your boat and your examination and you would conduct it in any manner that you chose and would not entertain our requests.

Thereafter when you got out of trial, you did contact me and advise that the boat was successful located just inside Alaskan waters laying on her starboard side in about only about  135 feet of water and that Global had successfully taken a ROV video that you'd viewed some of the contents of which you freely discussed with me. Specifically you advised that it showed that the SR was producing a visible oil sheen (which you felt would invoke pollution coverage) and that the crab pots were largely still on the vessel but many of their buoys had escaped their containment but were still tethered by their lines so as to float nearer to  (but not on the surface). You further related

that the Coast Guard was somewhat concerned that these underwater floating buoys might be a hazard to navigation to vessels passing over head - but that this likely could be rectified relatively inexpensively by a diver with a knife (and I would now suggest a possibly of an economically viable way to salvage many of the vessel's valuable pots).

Finally you advised a very relevant issue to Kevin and my clients that at least two bodies are shown on the video floating in the SR wheel house. This later revelation is not surprising given the survivors account that the rest of the crew was there, attempting to don their survival suits when the vessel made its last roll to starboard as these survivors (barely escaped) but that thereafter no others were seen to.

We concluded that conversation with your concurrent revelation that you felt  that the expenses of this examination were deductible (at least in part) from the Scandies Rose P&I "policy limits" (which you said, and repeated in your 2/25/20 email attached) were $10 M) but also revealed that because of the potential for oil pollution (The Scandies Rose having taken a substantial amount of fuel just before departing Kodiak in anticipation of fishing) that a discussing had occurred with pollution underwriter (which I  recall you saying were also $ 10 M  (independent) of the P&I policy. And that there had been discussions between the P&I and pollution carrier to at least "splits" this cost although the P&I carrier may have fronted it. You also advised that both the SR's P&I and pollution underwriters were having discussions with Global and at least the coast guard (which was aware of Global's actions) as to which would bear the future costs satisfying these to governmental agencies concerns and that you'd agreed to provide the USCG copies of the ROV Video.

As a result of these discussions and the presence of fuel coming from the SR, we discussed my views as to 1) whether any part of the first Global investigation was the responsibility of the P&I underwriter at all, but also whether any part of the subsequent remedial measure the USCG might require should be born by the P&I carrier (or if so it might be limited to the buoy removal). And finally we discussed whether in connection with any remedial diving efforts required by the Coast Guard an examination of the repairs to the vessel shortly before she set sail might be made or the bodies might be recovered which we then discussed otherwise might very well be prohibitively expensive depending on factors that could only be discovered if and when divers were required to go down to address primarily the CG's (but incidentally the State's) concerns. And finally I expressed my and my clients

willingness to consider working with you and your clients  to address the SR's various problems in that regard insofar as you contended that some of the costs of satisfying these governmental agencies  might ultimately "cost" my clients money if these expenses validly did came out of the policy limits. But I also remained concerned about our lack of ability to have any input into the Global ROV inspection dive of the scene and as a result to the future decision that might be made to satisfy bother these governmental agencies, preserve the scene and attempts to recover the bodies as a result.

And I expressed that  from my and my clients standpoint to be able to pursue those discussions that I wanted to at least:
 1) see actual copies of the policies and that your "opinions" as to what they provided was NEVER going to do,  as the actual policies are due us as part of your initial disclosures under the Federal Civil Rules and that regardless we needed them as part of  our professional duties to our clients to verify those actual policies say what you contend, both relevant to any settlement decisions that might follow or litigation decisions we might advise they make. And that is particularly true where as here you were representing that there was only $10M in coverage. Further still when subsequently in your discussions with Joe Stacy you advised there is in fact $1M more covering Mattsen Management. Now perhaps that was because Kevin and I didn't ask the "right" question but we were having these discussions in the context of the available insurance to cover these claims and you didn't volunteer that information to us and

2) additionally in my and my clients consideration of that overall issue, I would at least need to see the ROV video, Global's entire report of its dive and related investigation such as bottom conditions, currents etc, and

3) the "order of magnitude" Globals proposal that you anticipated receiving, and presenting to the USCG and the State of Alaska on possible remedial action that could be taken, and then what in response the USCG wanted taken and how that might effect your clients negotiations with the Alaska DNR. Again this similar to the insurance policies,  while arguably "work product" given the substantial cost of reproduction (which now given the time that's passed with the vessel sitting on the bottom exposed may not even be possible to recreate but that can't be known until seeing it, Global's response and proposed actions) would likely satisfy our showing of substantial need. And finally there was simply the humanitarian aspect of allowing the family to see the video of the bodies of their loved ones, the possibility of their retrieval and the closure both would bring.

I understood your response to all of the above was that you were going to have to check with underwriters but that your were inclined to recommend they be produced all in response to the likely favorable attitude toward settlement these good faith gestures could be expected to promote (but that no enforceable agreement was never made by other side). And that this exchange is  generally expressed in our exchange of your emails 2/25/20 and mine of 3/5/20 below:

On Feb 25, 2020, at 1:32 PM, Michael A. Barcott <Mbarcott@hwb-law.com> wrote:

 "The P&I limits on the SCANDIES ROSE are $1,000,000 primary and $9,000,000 excess for a total of $10,000,000 in P&I.  Including the Global bill and various other payments, there has been approximately $700,000 spent to date  (this is an estimate only).  We expect to have "order of magnitude" proposals from Global within a few days  that will address various plans, including retrieving remains and wreck removal."

**From:** "gmarkham@nwlink.com" <gmarkham@nwlink.com>
**Subject:** Re: SCANDIES ROSE Memorial
**Date:** March 5, 2020 at 12:11:14 PM PST
**To:** "Michael A. Barcott" <Mbarcott@hwb-law.com>

I take it this is someone in your office?

Also are you going to call me today about 1) copies of the policy 2) copies of the ROV video of the hull 3) Joe says you offered him copies of the repairs done to the vessel before it left Kodiak and Anacortes and and 4) my thoughts on alternatives to your issues regarding the Alaska DNR letter regarding vessel removal. I need a response ASAP  Mike because Joe's clients are putting some pressure on him to "do something" (i.e. file suit) and come the presumptive death hearing (now moved up to 4/15/20 all our clients will too.

I've been patiently waiting for your call (expected last week)

Jerry

But rather than responding positively to anything we discussed, 1) you advised you clients responded they were not currently inclined to produce the actual policies (no real explanation being offered but that you were working to secure their consent and 2) that the USCG had somehow become involved in the decision not to produce the ROV video because supposedly a promise was made to it that a copy of the ROV video would be provided them so they didn't send an investigating officer on the tug Global chartered out to the scene and that upon seeing it, someone (as I recall you said the commanding officer conducting the board of inquiry) had determined that it didn't want to ROV video entering the public domaine for fear that it would end up in the hands of the Deadliest Catch? But that it was the USCG's intent to release it at the inquiry? To that my response was that merely shows: A) that SR Fisheries LCC and its underwriters alone commissioned the ROV video not the USCG and regardless in turning a copy of it over to them, SR didn't lose possession, custody or control of its/your copies and B) that regardless by extensively discussing what it shows with with me you voluntarily waived any so called "privilege" (which was conditional at best) the USCG or SR had in it and 3) at least allowing the families to privately see it (just as USCG did the Mayday) was the human thing to do. But that regardless that still did not prevent you from producing the repair records, Global's estimate "Order of magnitude" and keeping us apprised of your communications with the ASCG and AK DNR.

Accordingly in an effort to go the extra mile and the hope that overtime you or your clients underwriters would see reason I tried to go the "extra mile" so to speak to and as the emails below reflect I offered to and did contacted my legislative resources in an effort to gain support for what I understood was your proposal to convince the USCG (who I was lead to believe assumed primary jurisdiction over the pollution issue) to only require remedial measures to stop the oil leaks (that would be paid primarily by the pollution policy, except perhaps for the buoy removal) and agree that the SR to be left where it is and that armed with that you were going to approach AK DNR about likewise allowing the vessel to remain. But that during any proposed dive on the SR (to satisfy the Pollution issue) the Global Divers would at least assess the feasibility of very inexpensively removing the bodies, your concern being that on impact with the bottom all of all the (several) doors to the wheel house might have become jammed (a prospect we feel very unlikely) and that videoing the area of the SR where the welding repairs were made shortly before the SR left Kodiak might not be possible due to the way she lies on the bottom and with the crab pots onboard blocking the view of the deck below where the welding of new steel plates occurred. Both being something we

could better address with benefit of the SR's records of the SR repairs (both in Anacortes and Kodiak), a copy of the ROV video, the Global reports of its first ROV investigation, and its subsequent "Order of Magnitude" (estimate) of its proposals to satisfy the USCG and AK DNR which I thought we were negotiating to work together on.  My 3/20/20 email shows that I went to  a great deal of time and effort on my part, to  present you with (in my view) a  very economic  proposal to in essence involve my legislative sources lawfully and the prospect of a successful outcome with the state.

But in response you barely looked at that (which you requested of me) and essentially rejected it out of hand with the response that your law firm could in essence do they same thing and the further representation that over the years you'd developed a good working relationship with Alaska DNR's manager  Ben Hagaedorn (who wrote the 1/2/20 letter to SR fisheries asking into the SR's intentions) and that you'd never been unsuccessful in negotiating an agreement with the the State to leave the vessel in place.  But that never the less, you now reverted to the proposition (suggested shortly after the sinking) that you still wanted to be able to represent to the State that that the SR victims family actually wanted to leave not only the vessel but also their loved ones bodies in it in the nature of a marine shrine or tomb or failing to agree not to be critical of SR fisheries and its underwriter decision to leave the vessel in place (and apparently make no other effort to remove the bodies).

And you further wanted (and apparently still want) that commitment from the victims  even though your underwriters have failed throughout these negotiations to act in good faith in producing that which I made you aware of the outset I needed to allow these families to address any of those proposals (or a middle ground)  by: 1) refusing to provide any of the above policies (that you represent require these victims to essentially bare the cost of all or a substantial part of expenses that the SR's underwriters incurred in the past and may occur in the future (as coming out of the P&I policy limits) and 2) the other policies that may in fact be liable for all or at least a substantial part of that loss 3) any disclosure or any agreement or negotiations with pollution underwriters to allow us to began to understand, let alone actually know what that part is) and 4) without providing us the ROV Video (purportedly at the request of the USCG - without any showing of authority of law that allows it or you to resist that production now or in the near future of this case) or 5) keeping us in the loop by providing us as indicated in your email of 2/5/20 with Global's:

"order of magnitude" proposals ... within a few days  that will address various plans, including retrieving remains and wreck removal.

copies of which by now you certainly should have addressed with the USCG and as suggested  in your 1/28/20 letter to Alaska DNR, (and which you represented in your communications  to me you wanted to be in a position to do by June when the seas calmed down to allow it). Well its now the middle of June and I'm assuming that you have addressed that the weather is such that you now can do that or still will. And my short response in the face of that is:

1) except in so far as the law of spoliation requires a vessel owner to leave the hull and how she lies (i.e. the accident scene) undisturbed in as much as it provides evidence of why the SR sank I'm not aware of any law that allows maritime victims  to control what the owners of a vessel can do with the hull. The resolution of what insurance pays for what ever resolution your clients make in that regard is for your clients, their insured's and the governmental powers that be. I've previously represented to you that while the USCG or Alaska DNR environmental division may have a claim to compel SR LLC to take action with regard to Oil pollution, I don't think the state of Alaska has the same rights with regard to a vessel which has a paramount maritime law navigational servitude to ply the waters above federal and state's submerged lands particularly where as here, Although there is not an abundance of directly applicable case law is not it clear (at this point in the absence of the ROV video and Global reports) that regardless of the SR's violation of the duty of seaworthiness and conduct that is negligent (underJones Act standards) to its crew, that if when in extremes in the course of its actions in defense of its crews  lives, it navigates into state waters to seek shelter from an icing storm but before remedial measure can be taken the vessel nevertheless sinks? See Terre Aux Boeufs Land Co., Inc. v. J.R. Gray Barge Co., 2000-2754 La.App. 4 Cir. 11/14/01, 803 So.2d 86 (La.App. 4 Cir. 2001 and as that case further holds the Federal Wreck act only applies to vessels that are hazards to navigation (and have been officially declared as such under the Corp of Engineer's promulgated regulations. See Schoenbaum, Admiralty and Maritime Law 2d pg. 276 fn. 19). And so far as I'm aware the SR has not been so declared and except possibly as to her floating crab buoys (that can be relatively easily remedied) she is not (again absent the ROV and Global reports you've denied us) we are not in a position to tell.

2)  But as or more  relevant to my client  as to the disposition of the SR's hull,  is the disposition of its deceased crews bodies which you've admitted lie within. We've now waited patiently for your of 2/5/20 emails promise of Global's:

 "order of magnitude" proposals ... within a few days  that will address various plans, including retrieving remains and wreck removal.

 But despite my March 5, 2020 email (and several since) and representing our willingness to wait patiently for what you promised would be provided in a "few days" so that we might know what SR LCC was considering doing and work with you and the involved authorities in June when the weather and seas were favorable and likely to permit something,  you've refused us the ROV video's, the insurance policies, the Global proposals Report and totally failed to keep us apprised of your negotiations with the USCG and Alaska DNR as to what their position is regarding what they are demanding SR to do with the hull.

And meanwhile I think you must know (for certainly anyone can imagine) what has been going on emotionally with the decedents survivors regarding this. Compounding the delays with their deceased death determinations are their feelings about these bodies decomposition meanwhile. Anyone who has ever long lined (or pulled up an old crab pot) in Alaska knows what sand fleas do to a halibut (or any fish that gets trapped in an untended pot) when they aren't regularly tended? And meanwhile these is also the possibility (remote though it is here) that the seas below may carry these bodies away. Accordingly your clients are now long overdue to a completely candid disclosure of not only that which I've identified above but instead all the information bearing on this issue now (much of which I'm certain that in your efforts on behalf the SR LCC and Mattsen Mgt.  to any resist any liability for these deaths you haven't disclosed to us? All of which ignores your duty to act reasonably with respect to retrieving your client's crews remains or reaching some other accord with the deceased that meet with their approval under the circumstances here.

But instead I've been told by Joe Stacy that your position has been that absent a firm agreement with you made now essentially in the blind

without the above information that you previously represented you'd
try to secure authority to provide, you've reverted to your initial
position of wanting to leave the vessel in place as some sort of
undersea " shrine" (which is obviously in your clients and their insured's
great economic interests  and you won't even approach the State of
Alaska DNR to try and address its concerns about the submerged hull
on state lands until the death victims agree?  Whereas my clients have
only recently become (indirectly) aware of this (if that is your current
position)  and held off contacting the state and the USCG independently
about their intentions with respect to the vessel out of deference to
your claims that you wanted to work with the death victim to a
resolution that is acceptable to them? So where are your clients
and their underwriters with respect to these agencies and these death
victims? Although I've heard this position orally from you before (and
felt I was going to have to rely on Joe to back me up) thank you for your
last email as solving my problems in that regard:

    "There is no chance of even discussing resolution until Jerry lets
us know what his clients want to do with the boat"

The forgoing makes it clear that except insofar as the SR is (temporarily)
and issue of  preserving evidence you actions here have never been
about "the boat". Its you client's boat Mike, except in so far as to what
the USCG and the Alaska DNR have to say, your clients have the right to
do what they want with it. I don't see that we have a legal right to stop
them. But when it comes to the bodies within the vessel your clients
are legally obligated to cooperate with the victims to come to a
resolution of what is to become of them in good faith in a respectful
and meaningful way. 1/.  But the forgoing makes it clear that you
haven't done that. On the contrary, you tried to hold them hostage as
leverage in a bad faith effort to settle this case in your clients
underwriters (both P&I and pollutions)  sole interests, and contrary to
their duty to their insured. How you thing are going to extract them

from that dilemma is of course up to you? But if it were me I'd start with the logical production of the above material I've made you aware throughout we need to address these potentially reasonable solutions (that you yourself thought logical as evidence by your communications.

And in that connection you recent proposal of today to wait until the Middle of August to even ***meet*** to discuss disclosures is totally unacceptable to my clients either from the stand point of litigation discovery generally or from the stand point of cooperating with the death victim to allow them to explore the return of their deceased's remains. Joe's early discovery permitted by rule that's been served on you would ordinarily be required to be answered well before mid-August, but the time to do so doesn't even start and its clear to me that the only reason the court set these dates so far out has been due to the pandemic and that you and your clients have clearly been taking unconscionable advantage of the shut down of the court's normal process that it has occasioned? Your one concession to allow us the death victims to proceed to make claims without having formally secured their confirmation as the deceased's PR's although supposedly justified as  facilitating discovery, will clearly not have that effect as a result of your unexplained failure to  default the rest of the world - without which the real possibility exists that late claims (allowable in the court's discretion and which typically are allowed if filed early on), will then be filed (including the State of Alaska's) and that will then be the basis for discovery delaying?

Accordingly I propose we have a FRCP 37 " good conference discovery conference to  address the production prior to a motion to compel answer to Joes discovery and/or set an earlier PTC conference date so that we might try to get this case back on the track.  If not then I guess we will see how this all plays out?

Stay Safe

Jerry Markham
Attorney for Brock Rainey
David Cobban and Arthur
Ganacias Estates

1/ But as or more  relevant as to the disposition of the SR's hull is the disposition of
its deceased crews bodies which you've admitted lie within, which is determined by
the law in Alaska in whose territorial waters on its seabed  you've conceded the SR
lies. And while there is a substantial body of maritime law that permits the captain of
a ship to commit the body of a seaman who dies on the high sea to the deep,  See
Floyd v. Lykes Bros 844 F2d 1044 (3rd, 1988), that is not authority for that
proposition that after a ship sinks in state waters and its crewmen bodies known to be
within that a vessel owner may either withhold evidence that would aid in his next of
kin's recovery of their remains, refuse to cooperate in an effort to do so when its
agents are diving on the ship anyway (either stoping oil or attaching tow cables
and buoyancy   (or their next of kin efforts to simultaneously retain their services) or
worse then take an action such as purposefully moving its ship out into to deeper
water and preventing or making it more difficult and expensive to do so.  On the
contrary the law is clear that a willful action that inhibits the next of kins ability to
bury a deceased's body is an actionable tort. See Gadbury v. Bleitz  223 P 299 (WA
1925) and  Edwards v. Franke, 364 P.2d 60, 63 (Alaska 1961) noting:

"It is generally the law in this country that the right to possess, preserve
and bury, or otherwise dispose of, a dead body belongs to the surviving
spouse and, if none such, then to the next of kin in the order of their relation to
the decedent; that a violation of that right is a tort; and that damages for
mental suffering are recoverable for a willful invasion of the rights relating to
dead bodies" (citing Gadbuty and like cases).

Modernly the "next of kins" right to possession  has been codified in most
states. See AS 13.75.020 and it  has been extended to not merely be limited to
willful conduct,  the mere negligent conduct or a party in possession of a body
toward it will do. See BROWN v. MATTHEWS MORTUARY, INC. 801 P.2d
37, 43-44  (Idaho 1990) and cases cited as well as Cochran v. Securitas Sec.
Services USA, Inc., **93 N.E.3d 493 (Ill. 2017)** and the Restatement (Second)
of Torts (1979)  § 868

Interference with Dead Bodies:

One who **intentionally, recklessly or negligently removes, <span style="color:red">withholds</span>, mutilates** or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body.

And as the Idaho Supreme Court in *Brown* noted " A plaintiff entitled to recover need not manifest any accompanying physical injuries in order to recover for emotional distress in this particular type of case.

And finally quite clearly the events that trigger this liability are separate and apart from the events that caused the loss of the SR on 12/31/19 but . rather could only have  logically be said to have arrisen from the SR's owners conduct following her sinking and specifically their discovery during ROV video of the bodies of the crew visible in the wheelhouse of their vessel in early February and their callous treatment of their next of kin's recovery of them since. This of course would also constitute a **separate occurrence** under the provisions of the SR's (and virtually every P&I insurance policy that I've ever seen that applies **per occurrence** described in *McCormick v. Chippewa* S-16619 (AK Supreme Court 3/20/20), see also McCormick v. Chippewa, Inc., 330 P.3d 345, 350 (Alaska 2014) which I know you were aware of (because you were so kind as to write me an email stating that during these negotiations)!